IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Alan Barry Goer and Albert Randall Goer, | ) | |
| | ) | C.A. #: 2 04-23234-23 |
| Plaintiffs, | ) | **ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| Jasco Industries, Inc. And Jay L. Austrian, | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court upon Defendants Jasco Industries and Jay L. Austrian's Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay this Proceeding pursuant to Rule 12(b)(6) and the Federal Arbitration Act ("FAA"). For the reasons set forth herein, the Defendants' motion to compel arbitration is granted, and this action is hereby stayed pending arbitration.

## BACKGROUND

Defendant Jasco, Inc. ("Jasco") is a New York corporation in the business of manufacturing store fixtures. Defendant Jay Austrian ("Austrian") is the founder and president of Jasco. Plaintiffs Alan Barry Goer and Albert Randall Goer ("the Goers") are both individual residents of South Carolina. Plaintiffs allege that they entered into a Letter of Understanding and employment agreements with a corporate entity named MG Goer, Inc., ("MG") that these agreements have been breached, and that Defendants Jasco and Austrian are liable to them for damages caused by this breach.

### A.    Letter of Understanding

During the summer of 2004, the Goers and Austrian entered into discussions with regard to creating an entity in South Carolina to manufacture store fixtures. In August of 2004, the parties

1

entered into a ten point Letter of Understanding (hereinafter "the Letter") regarding the creation of this entity, an S corporation established for the purpose of manufacturing store fixtures to be called MG Goer Inc. (Defs. Mem., Ex. A at 1). The parties agreed that the entity would be owned by Austrian and the Goers, "dba MG-Goer Inc." *Id.* The Goers agreed to purchase a 20% equity in "this new division and operating company" in return for $200,000 "payable to either Jay Austrian or his company" and a note payable to "either Jay Austrian or his company" in the amount of $300,000. *Id.* at ¶ 1. The Letter provided that employment contracts for the Goers would be "drafted and executed that reflect a salary of $250,000 per year for Alan Goer and $175,000 per year for Randy Goer." *Id.* at ¶ 5.[1] Austrian or Jasco agreed to guarantee or assume responsibility for the building lease, capital equipment lease and bank credit line to fund MG-Goer Inc. Division. *Id.* at ¶ 5. The parties agreed that company medical and 401K plans would be provided for full-time employees, with details of these benefit plans to be worked out at a later date. *Id.* at ¶ 9. In closing, the Letter provides that "[a]ll of the above points, while agreed to in principal, are also subject to the terms and conditions of a more formalized agreement presently being prepared." *Id.* at 2. While the parties contemplated that this future agreement was to be "a more detailed and definitive version" of the Letter, no new version was ever drafted or executed.

Plaintiff Alan Goer incorporated MG-Goer (Certification of Authorization dated July 26, 2004, Articles of Incorporation dated 26 July, 2004) and he was its sole incorporator. No MG stock was issued by or to any party, nor was a Board of Directors elected for MG by any party to the Letter. Jasco guaranteed a lease both for the property occupied by MG and for equipment to be used

---

[1] This same section provided further that "[o]ther terms and conditions of the employment contract will be defined and agreed upon." (Defs. Mem., Ex. A ¶ 5).

2

in the business of MG.[2]

### B. Employment Contracts

On or about July 1, 2004, Plaintiffs Alan Goer and Randall Goer entered into respective employment agreements with MG. Under the employment agreements, Alan Goer was hired as a President and Randy Goer was hired as a Vice-President of MG. Both Plaintiffs signed their respective employment agreements along with "Jay Austrian, CEO." (Defs. Mem., Ex. D at 13).

Alan and Randall Goer's duties and responsibilities as President and Vice-President, respectively, were to be "commensurate with those holding the office of President [or Vice President]" and included "active participation in the affairs of the Corporation." (Defs. Mem., Ex. D at ¶ 4(b); Ex. E at ¶ 4(b)). Alan Goer was also to serve on the Board of Directors. *Id.* at ¶ 4(c).

Most importantly for purposes of the pending motion, Section 20 of the employment agreements contained an arbitration clause, which provided:

> Arbitration. Any controversy or claim **arising out of or relating to this agreement**, or any amendment thereof, or the interpretation or breach thereof, shall be determined and settled by arbitration in Nassau County, New York, in accordance with the employment arbitration rules of the American Arbitration Association. Any award rendered therein shall be final and binding on each and all of the parties hereto, and judgment may be entered thereon in any court having jurisdiction.

---

[2] The court notes that the relationships amongst the relevant corporate entities was highly intertwined. For example, Jasco issued checks from its operating accounts to Plaintiffs, seemingly in their MG positions, "as outside labor/independent contractors." (Answer ¶ 26). Defendant Austrian signed those checks in his capacity as CEO of Jasco. Defendants maintain that those payments were made on behalf of MG and constituted loans from Jasco. *Id.*

Defendant Jasco admits that the Letter of Understanding referred to MG as a division of Jasco, but maintains that MG was a separately held corporation organized under the laws of South Carolina and incorporated by Plaintiff Alan Goer. *Id.*

3

(Defs. Mem., Ex. D and E, ¶ 20).[3]

On December 10, 2004, the Goers filed a complaint against Jasco Industries Inc. and Jay Austrian, CEO of Jasco, for alleged breach of contract and fraud related to the employment agreements and Letter. Specifically, the Goers allege that Defendants breached the Letter and employment agreements by failing to fund MG, by terminating its operations, by failing to issue stock to the Plaintiffs and by failing to pay Plaintiffs the compensation they were due under the employment contracts.[4] The Defendants responded with their motion to compel arbitration and dismiss, or in the alternative stay, the proceedings.

## DISCUSSION

### A.     The Federal Arbitration Act

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, reflects "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Underlying this policy is Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001). Accordingly, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Tr. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989). The Fourth Circuit has said that arbitration "'should not be denied unless it may be said with positive assurance that the arbitration [agreement] is not susceptible of an interpretation that covers the

---

[3] The employment agreements, although they postdate the Letter of Understanding, contain the details of the 401k plan.

[4] Plaintiffs argue that it would be inequitable not to pierce the corporate veil and hold the Defendants liable for the obligations and liabilities of their alleged alter-ego, MG.

4

asserted dispute.'" *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. "This stay-of-litigation provision is mandatory." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002). "A district court therefore has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Id.* (citing *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001)).

In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).[5] Plaintiffs' sole argument in response to Defendants' motion to compel arbitration is that "[a]s a general rule, an arbitration clause cannot be invoked by a non-party to the arbitration contract, and only parties to the arbitration agreement are bound to arbitrate." (Pl. Mem. at 4).

---

[5] 9 U.S.C. § 2 provides that

[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Here, the arbitration clause is contained within employment agreements that unquestionably involve commerce, and requires disputes to be resolved by arbitration.

5

### B.    Enforcement of an Arbitration Agreement by a Non-Signatory

As Plaintiffs argue, generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[6] *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960); *see also Zandford v. Prudential-Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997) (holding that arbitration may only be compelled when parties have agreed to it, and then only to the extent agreed.); *see also Arrants v. Buck,* 130 F.3d 636, 640 (4th Cir. 1997) ("[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate.").

A number of courts have held that because the right to compel arbitration derives from a contractual right, one who is not a party to the contract lacks standing to compel arbitration. *See Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir. 1993) ("An entity that is neither a party to nor agent for nor beneficiary of the contract lacks standing to compel arbitration[.]"); *Trompeter v. Boise Cascade Corp.,* 877 F.2d 686, 687 (8th Cir. 1989);[7] *Lorber Industries v. Los Angeles*

---

[6] The Supreme Court has directed that the court must "apply ordinary state law principles that govern the formation of contracts," *First Options,* 514 U.S. at 944, and the "federal substantive law of arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). Thus, state law determines questions "concerning the validity, revocability, or enforceability of contracts generally," *Perry v. Thomas,* 482 U.S. 483, 493 n. 9 (1987), but the Federal Arbitration Act, 9 U.S.C. § 2 (1994) "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24. Because the question of whether Jasco, a non-signatory, may enforce the arbitration clause in the employment contracts entered into between the Goers and MG presents no state law question of contract formation or validity, the court applies the "federal substantive law or arbitrability" to the present dispute. *See Int'l Paper,* 206 F.3d at 417 n.4.

[7] In *Trompeter,* the Eight Circuit Court of Appeals ended its inquiry after finding that a nonparty to the arbitration agreement did not have standing to compel arbitration. In contrast to this analysis, while a number of courts have stated that nonparties do not have standing to compel arbitration, almost all continue their analysis and consider if other bases, such as equitable estoppel,

*Printworks, Corp.,* 803 F.2d 523 (9th Cir. 1986)*; Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F.Supp. 853, 865 (D.N.J. 1992); *see also Jones v. Moneytree,* 686 So.2d 1166, 1168 (Ala. 1998) ("First Colonial has no standing to seek enforcement of the arbitration provision. . . . First Colonial is not a party to the contract containing the arbitration agreement, and it is clear from the language of the arbitration agreement that it applies only to the Joneses and Money Tree, the debtor and the creditor.").   However, most courts recognize that in certain circumstances, a nonparty to an arbitration agreement can enforce, or be bound by, an arbitration provision within a contract executed by other parties so long as it is the "appropriate case," or certain exceptions apply.   *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416-17 (4th Cir. 2000) ("Well-established common law principles dictate that in an appropriate case a non-signatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."); *Britton,* 4 F.3d at 744 (recognizing that generally a nonparty to an arbitration agreement does not have standing to invoke the agreement, but considering whether the nonparty could force arbitration because it was a third party beneficiary of the contract, a successor in interest to the contracting party, or an agent of the contracting party); *Thomson-CSF, S.A. v. Am. Arbitration Assoc.,* 64 F.3d 773, 776 (2d Cir. 1995) (noting numerous common law agency and contract principles under which nonparties to arbitration clauses may be bound to arbitration agreements of others).

Courts have allowed a non-signatory to an arbitration agreement to force one of the signatories to that agreement to arbitrate claims against it pursuant to a so-called "intertwined claims" test.   *See, e.g., Grigson,* 210 F.3d at 528-30; *Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.,* 659 F.2d 836, 841 n. 9 (7th Cir. 1981); *MS Dealer Serv. Corp. v. Franklin*,

_____

allow the nonparty to enforce, or be bound by, the arbitration agreement.

7

177 F.3d 942, 947 (11th Cir. 1999). Under the intertwined claims test, "the circuits have been willing to estop a signatory from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Thomson-CSF.,* 64 F.3d at 779; *see also Choctaw Generation Limited Partnership v. American Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir. 2001). For example, in *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757-58 (11th Cir. 1993) (emphasis added)*,* the Eleventh Circuit held that a signatory was bound to arbitrate with a non-signatory at the non-signatory's insistence because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *See also Long v. Silver,* 248 F.3d 309, 320 (4th Cir. 2001) (citing approvingly to *Sunkist* and applying the intertwined claims test); *Int'l Paper,* 206 F.3d at 417;[8] *Choctaw*, 271 F.3d at 404*; Grigson,* 210 F.3d at 528-9; *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.,* 863 F.2d at 320-321 (holding that a parent company may be compelled to arbitrate based on the arbitration agreement of its subsidiary even though it was a non-signatory to the agreement if the allegations against the parent are "based on the same facts and are inherently inseparable").

---

[8] In *Int'l Paper,* the Fourth Circuit cited to the intertwined claims test approvingly, but hinted that merely an intimate relationship between the claims and the contract obligation could not create an independent basis upon which to bind a non-signatory absent the non-signatory receiving a "direct benefit" from the contract. 206 F.3d at 418 n.6. In footnote six, the court, after mentioning the intertwined claims test, notes that "[t]he Second Circuit has held, however, that a close relationship and intimate factual connection provide no independent basis to require a non-signatory of an arbitration agreement to arbitrate with a signatory, and therefore that a non-signatory cannot be bound without receiving a 'direct benefit' from or pursuing a 'claim . . . integrally related to the contract containing the arbitration clause.'" *Id. (*quoting *Thomson-CSF,* 64 F.3d at 778-80). In the matter sub judice, a non-signatory seeks to bind a signatory to arbitration.

The rationale for preventing signatories from avoiding arbitration with non-signatories is based on principles of equitable estoppel. *See Int'l Paper*, 206 F.3d at 417; *see also Hughes Masonry Co.,* 659 F.2d at 840-41 (finding signatory equitably estopped from repudiating arbitration clause in agreement on which suit against non-signatory was based); *MS Dealer Serv. Corp.*, 177 F.3d at 947.[9]  In the context of agreements to arbitrate, equitable estoppel means that "a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Int'l Paper,* 206 F.3d at 418.  "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both

---

[9]  The Eleventh Circuit catalogued the various ways that nonsignatories could compel arbitration against signatories in *MS Dealer,* 177 F.3d at 947.  While the Eleventh Circuit is considered to apply the intertwined claims test, the court actually framed the test more broadly in *MS Dealer*:

> Existing case law demonstrates that equitable estoppel allows a non-signatory to compel arbitration in two different circumstances.  *First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.*  When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.  *Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.*  Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

(Internal citations and quotation marks omitted; emphasis added.); *see also Grigson,* 210 F.3d at 527 ("The Eleventh Circuit has taken the lead in applying equitable estoppel under the intertwined-claims basis.  The test, which rejects the narrow strictures urged by Appellants, is framed nicely by that circuit in *MS Dealer Serv. Corp. v. Franklin*.") (internal citations omitted).

disregard equity and contravene the purposes underlying the enactment of the Arbitration Act." *Id.* (internal citations omitted).

### C.    The Application of Equitable Estoppel in the Matter *Sub Judice*

In this case, there is no question that the arbitration clause contained in the employment agreements would be valid and enforceable between MG and the Goers. Here, however, MG has not been sued and accordingly does not seek arbitration. Instead, Defendants Jasco and Austrian, nonsignatories to the arbitration clause contained in the employment agreements,[10] seek to avail themselves of the agreement entered into by Plaintiffs and MG.

Here, the breaches of contract and fraud alleged by the Plaintiffs are inextricably intertwined with, and arise from, both the Letter and the two employment contracts. As one district court has observed, "[t]he essential question in situations such as these is whether Plaintiffs would have an

_____

[10]    The court is somewhat perplexed as to whether Austrian is truly a nonsignatory to the employment agreement containing the arbitration clause. The first page of the employment agreement provides

> This employment agreement (the "Agreement") is made and effective as of July 1,
> 2004 by and between MG Goer, Inc. . . . and Alan B. Goer [and Randy Goer].

(Defs. Mem., Ex. D and E at 1). However, as noted above, on the last page, the employment agreements are signed by the Goers and "Jay L. Austrian, CEO." *Id.* at 13. The court is unsure of whether Austrian was signing these agreements as a party to the agreement, or as a witness, as his signature appears after a provision stating

> In witness whereof, the parties hereto have executed this Agreement on the day and
> year first written above.
>                    MG-Goer, Inc.
>            By:    Jay L. Austrian, CEO
>                    Alan B. [or Randy] Goer

*Id.* Out of an abundance of caution, and because the agreements purport to be made between the Goers and MG (and not Austrian or Jasco, despite Austrian's signature), the court treats Austrian as a nonsignatory. In any event, this distinction is without import, as the court compels the matter to arbitration despite Austrian and Jasco's status as nonsignatories. Moreover, treating Austrian as a nonsignatory is consistent with the parties' arguments, as even Defendants appear to concede this point. *See* Def. Reply at 3 (arguing that Plaintiffs are equitably estopped from avoiding arbitration with "the [n]on-[s]ignatory Defendants.").

independent right to recover against the non-signatory Defendants even if the contract containing the arbitration clause were void." *Miro v. BDO Seidman, LLP,* 2004 WL 2418008, *7 (E.D.Pa. Oct. 20, 2004). "The plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." *In re Humana Inc. Managed Care Litig.,* 285 F.3d 971, 976 (11th Cir. 2002)) (rev'd on other grounds, *PacifiCare Health Sys. v. Book,* 538 U.S. 401 (2002)). In all cases, "the lynchpin for equitable estoppel is equity, and the point of applying it to compel arbitration is to prevent a situation that would fly in the face of fairness." *Hill v. GE Power Systems, Inc.,* 282 F.3d 343, 349 (5th Cir. 2002) (internal quotations omitted). The purpose of equitable estoppel is to prevent a plaintiff from "rely[ing] on the contract when it works to [his] advantage [by establishing the claim], and repudiat[ing] it when it works to [his] disadvantage [by requiring arbitration]." *Tepper Realty Co. v. MosaicTile Co.,* 259 F.Supp. 688, 692 (S.D.N.Y. 1996).[11]

*McBro,* 741 F.2d at 344, the paradigmatic example of when equitable estoppel properly applies, illustrates when a party's claims are sufficiently entangled with the underlying contract to warrant application of equitable estoppel. In *McBro,* a manager and a contractor each had a contract with a hospital for portions of a construction project. *Id.* at 342. Both of these contracts contained arbitration clauses. A dispute arose between the manager and the contractor, and the court held that this dispute had to be arbitrated because the duties the contractor claimed were breached by the

---

[11] Plaintiffs argue that the court may only compel arbitration in this case by finding that Defendants are the alter ego of MG. While this does provide a basis for compelling arbitration, *see Thomson - CSF,* 64 F.3d at 776, as Defendants argue, this is only one of many bases upon which the court may bind nonsignatories to arbitration agreements. *See, e.g., International Paper,* 206 F.3d at 417-19 (discussing the myriad theories upon which nonsignatories may enforce, or be bound by, arbitration agreements of others). The court refrains from making a determination of whether Defendants are the alter ego of MG.

manager were duties that arose under the contractor's contract with the hospital. *Id.* The court reasoned that the assignment of duties under the contract was the basis for the lawsuit, and thus the other conditions of the contract applicable to disputes, including the arbitration clause, had to be given effect. In short, because the contractor's claims could not have been adjudicated without interpreting, and potentially enforcing, the terms of the contract, the dispute between the parties was "intimately founded in and intertwined with the underlying contract obligations." 741 F.2d at 344.

Similarly here, the Goer's claims can not be adjudicated without interpreting, and potentially enforcing, the terms of the employment agreements. In fact, the Plaintiffs' theory of recovery largely depends upon the terms of the employment agreements. For example, Plaintiffs' complaint specifically pleads

> The Defendants have failed to pay the Plaintiffs under their employment contracts since October 1, 2004. Since the inception of Plaintiffs' employment, Defendants have withheld $916.16 per week from the Plaintiff Alan Goer and $721.12 per week from Plaintiff Albert Randall Goer.

(Compl. ¶ 41); *See also* Compl. ¶ 46 ("The Defendants have materially breached the terms of the Plaintiffs' employment contracts by failing to pay Plaintiffs' compensation due under theft[sic] contracts and by ultimately terminating the operations of the corporation."). As in *International Paper,* 206 F.3d at 418, the Goers are estopped from asserting that the lack of Austrian and Jasco's signatures on the employment agreements precludes enforcement of the agreements' arbitration clauses when they have consistently maintained that other provisions of the same contract should be enforced to benefit him. *See also Avila Group, Inc. v. Norma J. of California,* 426 F.Supp. 537, 542 (S.D.N.Y. 1977) ("To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act."). Accordingly, the Goers are equitably estopped from refusing to arbitrate

their claims with Austrian and Jasco.[12]  *See, e.g., Hughes Masonry,* 659 F.2d at 838-39 ("[I]t would

be manifestly inequitable to permit Hughes to both claim that J.A. [a nonsignatory] is liable to

Hughes for its failure to perform the contractual duties described in the [arbitration agreement] and

at the same time deny that J.A. is a party to the agreement in order to avoid arbitration of claims

clearly within the ambit of the arbitration clause."); *see also Sunkist,* 10 F.3d at 757; *J.J. Ryan &*

*Sons,* 863 F.2d at 315(claims founded on ancillary agreements were found to be arbitrable even

though they contained no arbitration clause, as without such agreement the main exclusive

agreement, which contained the arbitration clause, would be "largely illusory").[13]

---

[12]  In *Brantley v. Republic Mortgage Insurance*, C.A. 2:04-0805, D.S.C. (Dec. 1, 2004), this court thoroughly considered the issue of a non-signatory compelling a signatory to arbitration.  The Brantleys had obtained mortgage insurance from Republic Mortgage Insurance, as was required by their mortgage lender, Southstar Funding L.L.C.  In the litigation filed with this court, the Brantleys alleged willful and/or negligent violations of the Fair Credit Reporting Act against Republic on the grounds that Republic had set their insurance premium at a level higher than they were entitled to, and had based their premiums upon negative information in their consumer credit reports without informing them of this decision.  The Brantleys had entered in to an arbitration agreement with Southstar, which provided that "[a]ny claim, dispute or controversy. . . arising from or related to the loan . . . shall be resolved . . . by binding arbitration. . . "

Republic, a non-signatory to the arbitration clause, moved to compel arbitration.  The court found that the Brantleys in no way relied on the loan contract to establish their claims (nor did they allege concerted action between Republic and Southstar), and therefore, their claims were not intertwined with the underlying agreement to arbitrate.  Although the court decided not to compel arbitration in *Brantley*, the present case simply presents different facts which are readily distinguishable.  Unlike in *Brantley*, here, the Goers explicitly rely on the terms of the employment agreements in making their claims, thus seeking to obtain the benefits of that agreement while simultaneously denying the existence of one of its key provisions.

[13]  As an additional matter, the court finds that the Goers are bound to arbitrate their claims with Jasco and Austrian because it would be inequitable to allow them to avoid arbitration simply by not naming MG as a Defendant.  *See, e.g. Arnold v. Arnold Corp.,* 920 F.2d 1269, 1281 (6th Cir. 1990) (internal quotations omitted) (holding that "if a signatory to an arbitration agreement "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [Defendants] in his complaint, or a signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified.").

13

## CONCLUSION

It is therefore **ORDERED,** for the foregoing reasons, that Defendants' Motion to Compel Arbitration and Dismiss, or in the Alternative, to Stay This Proceeding is **GRANTED in part and DENIED in part**.  Defendants' request to compel arbitration is **GRANTED,** and the entire action is hereby **REFERRED** to arbitration.  This action is **STAYED** pending arbitration.  Accordingly, Defendant's Motion to Dismiss is **DENIED.**

**AND IT IS SO ORDERED.**

**s/ Patrick Michael Duffy**
**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**August 12, 2005**